## 20586. JOHNSON *v.* THE STATE.

CANDLER, Justice. Nathaniel Johnson, a negro, was indicted in Richmond County for the offense of raping a named white woman. He was convicted without any recommendation, and sentenced to be electrocuted. He moved for a new trial on

the usual general grounds, later amended his motion by adding four special grounds, and excepted to a judgment denying his amended motion. *Held:*

1. The general grounds of the motion for new trial are without merit. The evidence is voluminous, but a brief statement of it shows the following facts: The victim worked at Talmadge Memorial Hospital in the city of Augusta. She left the hospital alone on January 27, 1959, about 11 p.m. for the purpose of going home. While she was getting in her car, which was parked on the hospital's parking lot, the accused drove his car up and stopped it just to the rear of hers, immediately got out of his car, seized her, and threatened to kill her if she did not get into his car. She got away from him and ran a few feet before he caught her while she was screaming for help. At that time he again threatened to kill her if she did not stop screaming. He then dragged her back to his car, picked her up and threw her in the front seat. She told him to take her money and leave her alone, but he replied, "I don't want money, I want you." While he was closing the door of her car, she got out of his car and ran screaming to the lawn of the hospital where he again caught her, and dragged her back to his car, trying at the time to get his hand around her throat to stop her screams. She broke loose from him and again ran, but he caught her, knocked her down, repeatedly slapped her in the face, and told her to shut up or he would kill her. He placed his knee on her chest, pinning her down, put his hand in her throat into the trachea and kept bearing down on it, telling her at the time to quit screaming. He closed her nostrils with his other hand, and since she could not get air, she lost consciousness. When she regained consciousness, she realized that she was in the back floorboard of a moving automobile. Every time she tried to raise up, he would knock her down, telling her he would kill her if she did not behave. She managed to get the front seat pushed over and opened the car door; she was half-way out of the car when he reached over, and by her hair, clothes, and body managed to drag her back into the car and close the door. He then threw her down on the floorboard of the front seat. She kept begging him to let her up, that she was nauseated and was going to vomit. He drove some distance out of Augusta in Richmond County, and finally stopped his car on a dirt road, opened the door, pushed her out and tore all of her clothing off. He said he

had always "wanted a white woman because they have such pretty white skin." He then tried by force to have carnal knowledge of and connection with her against the order of nature (in a way defined by Code § 26-5901 as constituting the offense of sodomy). Immediately following his failure to accomplish that act, he had sexual intercourse with her forcibly and against her will. He then had her put some of her clothing on, all that was not completely unusable. He drank something out of a can which he had in his car, threw the can away, and got a bottle of whisky from under the front seat, drank some of it, and asked her at the time if she drank. She replied that she did not, that she was a Sunday school teacher, and that her class consisted of several boys. He then took her to the back of the car, pinned her against the back fender, and again had intercourse with her forcibly and against her will. After that he forced her back into the car, and with her torn blouse wiped the blood on the back upholstery, where she had bled. He started the car and told her that he did not know what he could or would do with her; that he could not "burn but once"; and that while driving back toward Augusta, he would slow down at ponds and say he could not release her. She begged him to let her go and promised him that she would not tell her family of the occurrence. He then drove to an alley in Augusta, took her billfold, and wrote her name, address, telephone number, and her husband's name down on a piece of paper and put it in his pocket with her pen. He handed back to her a five-dollar bill which was in her billfold, but kept her change. After exacting a promise from her that she would not report the affair, he carried her back to her car on the hospital property, telling her that he would follow her home. When she got home, her oldest child, a thirteen-year-old son, was waiting up for her, and since her husband was at that time working in South Carolina, she immediately called her pastor at 1:25 a.m. He, his wife, and their daughter came at once to her home after calling her sister and her husband, who also came. As soon as they arrived, she told them what had occurred. Her sister testified that she was in a shocked condition, had bruises and scratches all over her body, and she was then carried to a hospital. The police were called from there and she gave them a description of her assailant and of the car he was driving. During the same night, the car which she had de-

scribed was found in front of the home of the accused. He was taken into custody, and a few hours later she picked him out of a line-up of seven men similar to him in size and dress. She positively identified him as the person who had raped her. Pictures taken of the victim immediately after the assault and placed in evidence without objection show several severe scratches and bruises on her face, head and throat, and testimony offered by the State shows that her clothing was badly torn and bloody. Dr. W. F. Pryor, a witness for the State, testified that he examined the victim soon after the alleged rape, and that she had many severe bruises on her face, her neck, and her legs, particularly about her thighs, all of which had been bleeding. He testified that he was deeply concerned about the swelling in her neck which resulted from the bruises and the accumulation of blood under the skin in that part of her body and the possibility of such an injury completely blocking her air passage. The investigating and arresting officers testified that the accused first stated to them that he got home on the night of the assault about 10 o'clock and remained there during the rest of the night, and that he had not loaned his car to anyone that night. Later he said that he had loaned his car that night to a named soldier at Fort Gordon. Still later he admitted that he had picked up the person alleged to have been raped at the hospital; that he forced her into his automobile; that she was screaming and caught hold of his horn button and was blowing the horn; that he reached into the car and with both hands choked her, pulled her away from the horn, and stopped her from screaming and then drove away; that he tried to persuade her to have intercourse with him; that she, for some time, refused to consent, but finally consented; and that he then had intercourse with her. He later went with and showed the investigating officers the place in Richmond County where he said the intercourse occurred.

2. Special grounds 1 and 2 complain about the admission of certain testimony as given by Mrs. C. E. Bailey, a witness for the State, and of a remark the solicitor-general made while she was on the witness stand. One of the grounds alleges that the court erred, over an objection that it was not pleaded in the indictment against the accused, in allowing the witness to testify that he made an assault on her during August of 1956 while she was sitting in her car in front of a place of

business in Augusta, Georgia; that he choked her; and that, when she started screaming and offered him money, he said, "I don't want money, I want you." Over this objection, it was not erroneous to allow the testimony in evidence. The other ground alleges that the trial judge erred in refusing to grant a mistrial on motion therefor, when the solicitor-general stated in the presence of the jury that he wanted to prove by Mrs. Bailey, the witness, that the accused, while making the assault on her in 1956, used the same expression as the one he used while assaulting the victim in this case, namely, "I don't want money, I want you." In the circumstances of this case, the remark complained of was not improper; and this being true, the court did not err, as contended, in denying the defendant's motion for a mistrial.

3. Special ground 3 alleges that the court erred in giving the following charge to the jury: ". . . I charge you, where knowledge, motive, intent, good or bad faith, or other matters dependent upon the person's state of mind are involved as a material element in a criminal offense with which the defendant is charged, evidence of the defendant's conduct with reference to similar transactions about the same time, is admissible for the consideration of the jury insofar only as they may tend to demonstrate the state of defendant's mind on the subject involved. Whether they illustrate it or not is a question solely for you gentlemen of the jury. Any evidence with reference to any other transaction of the defendant should be limited by the jury in its consideration as to the state of the defendant's mind with reference to the subject involved in the case on trial." The criticism against this portion of the charge is that it was misleading, that it was confusing, and that it was based on evidence illegally admitted. The charge is not subject to this criticism.

4. Special ground 4 alleges that the trial judge erred in charging the jury on the law of confessions of guilt. It is not contended that the instruction as given was abstractly incorrect, but it is urged that the evidence did not authorize such a charge. Respecting this, the evidence shows: The accused, prior to his statement which the State contends was a voluntary confession of his guilt, was fully advised that he was accused of raping the person who picked him out of a line-up of six other men. George Mutimer, Chief Deputy Sheriff of Richmond County and a witness for the State, testified: He

talked to the accused about the charge against him, at the county jail for about one hour during the morning after the alleged rape. During most of the conversation, he and the accused were alone. The accused related to him in detail how he approached his victim, the party alleged to have been raped on the parking lot of the Talmadge Memorial Hospital, stating she was a stranger to him since he had never before seen her. He told the witness of his struggle with her, of the force he used in getting her into his car, how she was screaming and blowing the horn on his car when he got in it, and how he with both of his hands choked her, pushed her back and stopped her from blowing his horn and from screaming. The accused then stated that he carried her to a place on a dirt road which leads off from the New Savannah Road—a place to which he had carried other girls. At this place he talked to her for quite a while trying to get her to consent to have intercourse with him; that she refused to give such consent; and that she later said, "Go ahead then and get it over with." He said that he then began to have intercourse with her but before he finished she made him get off her; that she got out of the car and ran into some bushes near a pond, where he caught her, picked her up—tearing her skirt at the time, and brought her back to the car. He said that he then brought her back to the hospital property, where her car was parked and let her out of his car. It is argued that the statement made by the accused to the witness Mutimer does not amount to a confession of guilt of the offense charged against him because of the words, "Go ahead then and get it over with." This argument is not persuasive. Consent to sexual intercourse which is obtained by force and violence does not prevent the sexual act from being one of rape. *Melton* v. *State*, 184 *Ga.* 343 (3) (191 S. E. 91). Consent to sexual intercourse obtained through a present and immediate fear of serious bodily injury to the female involved is the equivalent of no consent at all, and an act of intercourse consummated under such circumstances cannot be said to have been committed with the consent of the female. *Vanderford* v. *State*, 126 *Ga.* 753 (5) (55 S. E. 1025). In the case just cited, the movant in his motion for new trial alleged that the court by two specified portions of his charge to the jury erroneously instructed them respecting the element of force necessary to constitute the crime of rape, and it was there unanimously

held: "Both of these charges substantially informed the jury that force was a necessary element of the crime of rape, but that it might be exerted not only by physical violence, but also by threats thereof causing fear of serious bodily harm, which overpowered the female and caused her to yield against her will. This is the law." In 44 Am. Jur. 906, § 7, the author says: "Resistance is necessarily relative. It is accordingly not necessarily illogical for courts to apply the requirement of most vigorous resistance to common cases, and to modify it in varying degrees and peculiar circumstances, and to refuse to apply it to exceptional cases. In all cases, the circumstances and conditions surrounding the parties to the transaction are to be considered in determining whether adequate resistance was offered by the female." And as authority for this statement, the holdings in rape cases from several jurisdictions are cited where the force employed and the female's consent to the sexual act were directly involved. Since the evidence in this case authorized a charge on the law of confessions of guilt, this ground of the motion is without merit.

*Judgment affirmed. All the Justices concur, except Wyatt, P. J., who dissents.*

ARGUED SEPTEMBER 14, 1959—DECIDED OCTOBER 9, 1959—REHEARING DENIED NOVEMBER 4, 1959.

*R. William Barton, Jack L. Cooper, James L. Lester,* for plaintiff in error.

*George Hains, Solicitor-General, Eugene Cook, Attorney-General, Rubye G. Jackson, Deputy Assistant Attorney-General,* contra.

WYATT, Presiding Justice. I dissent from the rulings in divisions 2 and 3 and from the judgment of affirmance.